IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

JAMES BACA,

                  **Plaintiff,**

vs.                                          Civ. No.  08-019 JCH/WDS

BERNALILLO COUNTY PARKS AND
RECREATION DEPARTMENT, BOARD OF
COUNTY COMMISSIONERS,
BERNALILLO COUNTY MANAGER
THADDEUS LUCERO, In His Official and
Individual Capacity, HUMAN RESOURCES
DIRECTOR RENETTA TORRES, In Her
Official and Individual Capacity, JUVENILE
DIRECTOR TOM SWISSTACK, In His
Official and Individual Capacity, and OPEN
SPACE/PARK ADMINISTRATOR CARL
"CHIP" BERGLUND, In His Official and
Individual Capacity,

                  **Defendants.**

## MEMORANDUM OPINION AND ORDER

This matter comes before the Court on Defendants' *Motion to Dismiss Counts I, II, V, VI, VII, VIII, IX, X, AND XI*, filed October 20, 2008 [Doc. 26], Defendants' *Motion for Partial Summary Judgment*, filed October 20, 2008 [Doc. 27], and Defendants' *Motion for Partial Summary Judgment of Plaintiff's Amended Complaint*, filed March 3, 2009 [Doc. 46].  Through a joint motion filed November 5, 2008 [Doc. 29], the parties dismissed Count VIII in its entirety, and dismissed Counts I, II, III, V, and VI against the individual Defendants.  The Court issued an Order on February 17, 2009 [Doc. 42] that dismissed Counts VI and VII with prejudice and dismissed Counts I and II without prejudice.  Plaintiff refiled Counts I and II in his Amended

Complaint on February 27, 2009 [Doc. 44].  Thus, all counts except VI, VII, and VIII remain to be addressed at this time.  The Court having considered the motions, briefs, and relevant law, and being otherwise fully informed, finds that Defendants' *Motion to Dismiss Counts I, II, V, VI, VII, VIII, IX, X, AND XI* and *Motion for Partial Summary Judgment of Plaintiff's Amended Complaint* should be granted in full, and that Defendant's *Motion for Partial Summary Judgment* [Doc. 27] should be granted in part and denied in part.  As a result of this decision, the only claim remaining is the age discrimination claim under Count III, and, due to the joint motion filed November 5, 2008 [Doc. 29], that remaining claim does not lie against any individual Defendant.

## BACKGROUND

This case involves a long-time employee of the Bernalillo County Parks and Recreation Department who was subjected to an allegedly baseless investigation for misconduct, who was allegedly disciplined despite being eventually cleared of the wrongdoing of which he was accused, who received an involuntary transfer to another position, and who ultimately resigned from his new position, claiming that he was constructively discharged.   Because of the procedural posture of the case, the Court views the following facts in the light most favorable to Plaintiff and allows Plaintiff the benefit of all reasonable inferences to be drawn from the evidence.

Plaintiff, a Hispanic male who was approximately 45 years old at the time of the events leading up to this suit, began working for Bernalillo County Parks and Recreation Department as a Groundskeeper in 1979.  Plaintiff worked his way up to become one of the Department's Parks Area Supervisors, and by 2004, he had been a Supervisor for 16 years.  Beginning approximately

April 19, 2004, one of the employees that Plaintiff supervised, Robert Kline, became

uncooperative and began to act in a belligerent manner.  For two days, Mr. Kline continued to

act disrespectfully toward Plaintiff, including swearing at him and physically threatening him

over the telephone.  On April 20, 2004, Plaintiff sent Mr. Kline home early, wrote up a discipline

report, and reported his behavior to Joanne Caffrey, the Director of the Parks and Recreation

Department.  Several days later, Plaintiff met with members of his work crew to address their

concerns about Mr. Kline and to remind them of County policies with regard to matters such as

breaks, lunch schedules, and cell phone use.  The next day, April 27, Director Caffrey

summoned Plaintiff and an Assistant Parks Area Supervisor to meet with her and the "Blue

Collar Union Representatives" to discuss allegations that Mr. Kline had made against Plaintiff.

Director Caffrey advised Plaintiff that, during the investigation of the allegations, Plaintiff was

not to go near or speak to his crew, and that he was to report to the main office in the morning.

On April 28, Plaintiff received a "Change in Work Assignment" letter from Director

Caffrey.  The letter explained that Plaintiff had been accused of engaging in retaliatory conduct

toward members of the Blue Collar Collective Bargaining Unit after Union Officials contacted

the County to advise it that Plaintiff had been treating employees inappropriately.  *See*

Defendants' Motion for Partial Summary Judgment (hereinafter "Def't. Mot. 2") [Doc. 27], Ex.

4.  The letter also said that Plaintiff stood accused of falsifying time reports, accepting

compensation for time that he did not work, and representing to the County that employees he

was supervising were working when they were engaged in other activities.  *Id.*  The letter went

on to note that, because the Union and other employees had raised the fear of retaliation,

Director Caffrey was electing to reassign Plaintiff from his regular job duties during the

pendency of the investigation to permit a full, fair, and thorough investigation by the Human

Resources Department, and to protect Plaintiff and the County from being subject to other claims

of retaliation during the investigation.  *Id*.  As a result, Plaintiff was ordered to have no contact

with the employees that he supervised or any other County groundskeeping crews.  The letter

assured Plaintiff that he would continue to receive the same compensation and benefits that he

received during his regular work assignment.  *Id*.  The letter noted Director Caffrey's

understanding that Plaintiff had retained counsel regarding his reassignment.  It also

memorialized the message Plaintiff gave to Director Caffrey in a meeting that morning, that he

was a "Hispanic Male over the age of 40 who is nearing retirement."  *Id*.  In response to this

message, the letter reiterated the County's nondiscrimination policy.

  During the next several months, while the investigation was ongoing, Plaintiff rarely had

an office available for his use, and he had to sit in a chair in an open area of the main office of

the Parks and Recreation Department when he was not working on projects.  Plaintiff alleges that

he often was given no work to do, and was mocked by coworkers and subordinates while sitting

in the chair.  During this time, the investigation continued, with Plaintiff being interviewed at

least one time in the presence of his attorney.  As part of the investigation, Director Caffrey

directed Plaintiff to create a list of all work assignments that his crew had completed since

January 1, 2004.  Plaintiff alleges that no other supervisors were required to create such a list.

During the period of the investigation, Plaintiff's supervisor was overheard telling one of

Plaintiff's co-workers that she planned to "put [Plaintiff] in the back somewhere until he retires."

During the same period, supervisors asked Plaintiff several other times about when he planned to

retire.

On October 29, 2004, as a result of the investigation, Plaintiff received a written reprimand.  That same day, he was transferred from his position as a Parks Area Supervisor to a newly created position as a "Coordinator" at the County's Juvenile Detention Center ("JDC"). The record shows that through a meeting with the County Manager, the written reprimand was reduced to a verbal reprimand, but Plaintiff contends that any reprimand was unwarranted, and that his transfer to a new position was an adverse employment action.  In his position at the JDC, Plaintiff no longer had a supervisory role, a clear job title, a job description, or an office.  He claims that he did not receive proper training for his new job, and that he was not allowed to do the job he had been transferred to perform, which nominally was to develop a program to teach landscaping skills to residents of the JDC.  Ultimately, Plaintiff retired from his position at the JDC.  Although he currently receives retirement benefits from the County, he brought this suit contending that he was constructively discharged and alleging other mistreatment.

The following claims remain in Plaintiff's suit: (I) Breach of Employment Contract; (II) Breach of Implied Covenant of Good Faith and Fair Dealing; (III) Unlawful Age Discrimination in Violation of the Age Discrimination in Employment Act of 1967; (IV) Unlawful Race Discrimination in Violation of the New Mexico Human Rights Act; (V) Constructive Discharge; (IX) Violation of Plaintiff's Right to Freedom of Speech; (X) Violation of Plaintiff's Due Process Rights Under the Fourteenth and Fifth Amendments; and (XI) Violation of Plaintiff's Right to Freedom of Association.

**LEGAL STANDARD**

Summary Judgment is appropriate if "the record contains no evidence of a genuine issue of material fact and demonstrates that the moving party is entitled to judgment as a matter of

law." *Anderson v. Liberty Lobby, Inc.*, 447 U.S. 242, 247 (1986); *Woodman v. Runyon*, 132 F.3d 1330, 1337 (10th Cir. 1997); Fed. R. Civ. P. 56(c).  The Court views the record and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party. *Thomas v. Int'l Bus. Machs.*, 48 F.3d 478, 484 (10th Cir. 1995).  The moving party has the initial burden of showing there is no genuine issue of material fact.  *Anderson*, 477 U.S. at 256.  Once the moving party has met its burden, the non-moving party must do more than merely show that there is some doubt as to the material facts.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  The non-moving party may not rest on the mere allegations or denials of the pleadings, but must set forth specific facts showing a genuine issue for trial. *Anderson*, 477 U.S. at 248, 256.  Although the Court views the evidence and draws all inferences in the light most favorable to the party opposing summary judgment, that party still "must identify sufficient evidence which would require submission of the case to a jury."  *Mares v. ConAgra Poultry Co.*, 971 F.2d 492, 494 (10th Cir. 1992).  Unsupported allegations, conclusory in nature, are insufficient to defeat a proper motion for summary judgment.  *Anderson*, 477 U.S. at 248.  Simple "[s]peculation or hunches admidst rumor and innuendo will not suffice." *Maestas v. Segura*, 416 F.3d 1182, 1189 (10th Cir. 2005).

## DISCUSSION

A. <u>Breach of Employment Contract</u>

As part of his employment with Bernalillo County, Plaintiff received a copy of a handbook entitled "Bernalillo County Employment Relations Rules and Regulations" ("Rules and Regulations").  Plaintiff alleges that the Rules and Regulations constitute an employment contract, and that Defendants breached that contract by not following the grievance procedures

6

outlined in the Rules and Regulations.  The Court must first determine whether the Rules and

Regulations could constitute a contract under New Mexico law.  Although New Mexico

governmental entities generally receive immunity from actions based on a contract, other than

those based on a valid written contract, NMSA 1978 § 37-1-23(A), New Mexico courts have

recognized a limited exception to this immunity for implied-in-fact contracts where a contract is

inferred from an employer's handbook or manual.  *See Garcia v. Middle Rio Grande

Conservancy Dist.*, 121 N.M. 728, 732 (1996).

In order to reach the level of creating a contractual right, the terms of the employer's

representation must be sufficiently explicit to create a reasonable expectation of an implied

contract.  *See Trujillo v. N. Rio Arriba Elec. Co-op, Inc.*, 131 N.M. 607, 616 (2001); *Garrity v.

Overland Sheepskin Co.*, 121 N.M. 710, 713 (1996); *Hartbarger v. Frank Paxton Co.*, 115 N.M.

665, 672 (1993).  The Rules and Regulations contained a disclaimer, which Defendants argue

necessarily prevented any reasonable expectation of an implied contract.  *See* Motion for Partial

Summary Judgment of Plaintiff's Amended Complaint (hereinafter "Def't. Mot. 3") [Doc. 46],

Ex. 1 ("The Board of County Commissioners...in adopting these Rules and Regulations does not

intend that these...Rules and Regulations constitute a contract of employment, nor an offer to

enter into a contract of employment.").  However, the existence of a signed disclaimer is not

sufficient, by itself, to defeat a claim of an implied contract, because "an implied contract can

still exist in spite of a disclaimer, where the employer's conduct reasonably leads employees to

believe that they will not be [disciplined] without just cause and a fair procedure."  *Kiedrowski v.

Citizens Bank*, 119 N.M. 572, 575 (Ct. App. 1995).  *See also McGinnis v. Honeywell*, 110 N.M.

1, 6 (1990) (despite disclaimer, sufficient evidence existed to find a contract where evidence was

presented that company's policy was to take uniform and consistent actions regarding termination, supervisors were required to follow written policies, and company followed its written policies to the letter).

Ultimately, whether or not an employee handbook created an implied-in-fact contract is a question of fact to be determined by looking at the totality of the parties' statements and actions regarding the employment relationship. *See Newberry v. Allied Stores*, 108 N.M. 424, 427 (1989). In certain cases, this question is ripe for summary judgment, because an employee's expectations of an implied contract "must satisfy a certain threshold of objectivity" before they can be considered "reasonable." *Keidrowski*, 119 N.M. at 575. *See also Hartbarger,* 115 N.M. at 672 (holding that because employee's expectations regarding creation of an implied contract were not objectively reasonable, employer was entitled to judgment as a matter of law). However, New Mexico courts have held that whether promissory statements in a manual were sufficiently explicit to create an implied-in-fact contract, and whether reliance on those statements was reasonable, even in the presence of a disclaimer, is generally a question for the jury. *See Mealand V. Eastern N.M. Med. Ctr.*, 131 N.M. 65, 70 (Ct. App. 2001).

In this case, the Court finds that the Rules and Regulations were sufficiently explicit to make Plaintiff's reliance on them objectively reasonable. The Rules and Regulations explicitly set out standards for disciplinary actions, including a program of progressive discipline and a set of employee rights such as the ability to grieve certain actions. *See* Def't. Mot. 2 [Doc. 27], Ex. 2 at 28-32. These standards used language purporting to bind the employer. *See id.* at 28 ("A classified employee shall have the right to...file grievances"); *id*. at 29 ("Disciplinary action against an employee shall be consistent with departmental policies and these Rules and

Regulations.").  Thus, whether the Rules and Regulations constitute an implied-in-fact contract upon which Plaintiff reasonably relied is a question of fact that is inappropriate for summary judgment in this case.

Nonetheless, even assuming for summary judgment purposes that the Rules and Regulations constituted a contract upon which Plaintiff was entitled to rely, he cannot prevail on his breach of contract claim because he has failed to come forward with evidence that Defendants materially breached any specific provision of the Rules and Regulations.  Although Plaintiff claims many slights and alleged acts of mistreatment at the hands of Defendants, his breach of contract claim comes down to two specific allegations.  Plaintiff alleges that Defendants violated the Rules and Regulations by issuing him a written reprimand on October 29, 2004, and by not acting upon the grievance that he filed in relation to that reprimand.  *See* Amended Complaint [Doc. 44] at 12, ¶¶ 107-110.  Plaintiff also contends that, under the progressive discipline policy, he should have received a verbal reprimand rather than a written reprimand, if he received any discipline at all.  *See id.* at ¶ 108.  These allegations are not supported by the evidence in the record.

On April 28, 2004, Bernalillo County Parks and Recreation Department Director Joanne Caffrey advised Plaintiff in a letter that he was being temporarily reassigned during the course of a workplace violence investigation against Plaintiff in order to prevent him from further intimidating or retaliating against potential witnesses.  *See* Change in Work Assignment, dated April 28, 2004, attached as Ex. 4 to Def't. Mot. 2 [Doc. 27].  This letter also referred to a statement that Plaintiff made to the Director when notified of the investigation that his attorney asked him to remind the County that Plaintiff was "an Hispanic Male over the age of 40 who is

9

nearing retirement," and it reiterated the County's policy of nondiscrimination toward any member of a protected class.  *Id.*  Following the April 2004 investigation, Plaintiff received a written reprimand on October 29, 2004 from County Manager Thaddeus Lucero.  *See id.*, Ex. 5. That same day, Plaintiff also received a Notice of Transfer, indicating that he was being transferred from his position as a Parks Supervisor in the Parks and Recreation Department to become the JDC Service Projects Coordinator at the Juvenile Detention Center.  *See* Def't. Mot. 2 [Doc. 27], Ex. 8.

According to the unchallenged deposition testimony of Thaddeus Lucero, the County's disciplinary committee had initially planned to issue a suspension to Plaintiff based on the results of their investigation of him.  *See* Plaintiff's Response to Defendant's Motion for Partial Summary Judgment (hereinafter "Pl. Resp. 3") [Doc. 51], Ex. 2 at 29.  That potential suspension was reduced to a written reprimand by the County Manager, allegedly as the result of pressure put on him by several Bernalillo County Commissioners who had been contacted on Plaintiff's behalf by Plaintiff's sister Mary Herrera, who served at that time as Bernalillo County Clerk. *See id.*  The written reprimand delivered to Plaintiff on October 29, 2004 advised Plaintiff of the right to grieve the action through Step Two of the grievance process.  *See* Pl. Resp. 3 [Doc. 51], Ex. 1.  Plaintiff sought a Step Two grievance through a letter dated November 4, 2004.  *See id.*, Ex. 4.  This letter outlined the reasons he believed a written reprimand was inappropriate, and concluded by requesting that the written reprimand be rescinded and removed from his personnel file, and that he be placed back into his prior job assignment.  *See id.*

Step Two of the grievance process enables the grievant to meet with the County Manager or his designee to discuss the grievance.  *See id.*, Ex. 3 at § 705(C).  The County Manager

testified that, at a meeting with Plaintiff, he then reduced the written reprimand to a verbal

reprimand.  *See* Defendants' Reply in Support of Motion for Summary Judgment (hereinafter

"Def't. Rep. 2") [Doc. 37], Ex. 15 at 37:16-24, 43:19-21, 49:16-18.[1]  Verbal reprimand notations

are not placed in an employee's personnel file and are not subject to a grievance procedure.  *See*

*id*. at 38:6-8, 50:4-7; Def't. Mot. 2 [Doc. 27], Ex. 2 at § 605(B)(1).  Similarly, the ability to

transfer employees to serve the needs of the County is a right explicitly retained by management

in the Rules and Regulations, and a transfer is not a grievable action.  *See* Def't. Mot. 2 [Doc.

27], Ex. 2 at §§  601(B), 703(A)(8).

Given this evidence, Plaintiff has failed to support a claim for breach of contract based

on a violation of the Rules and Regulations.  A Step 2 grievance allows an employee to have a

disciplinary determination reviewed by the County Manager or his designee.  Plaintiff had the

opportunity to meet directly with the County Manager, and he was successful in meeting the

goal of his grievance–having his written reprimand removed from his personnel file and reduced

to a verbal reprimand.  Because of the process afforded him, Plaintiff was able to avoid the

greater discipline that had initially been sought by the County.  Even if the meeting with the

County Manager that resulted in the written reprimand being reduced to a verbal reprimand was

---

[1] Plaintiff and the County Manager set a follow-up meeting for November 4, 2004, but the
County Manager testified that he did not recall whether that meeting took place.  *See* "Def't.
Rep. 2") [Doc. 37], Ex. 15 at 39:22-40:3.  The record is unclear concerning whether the
reduction to a verbal reprimand occurred on October 29, 2004 or at a later meeting, but,
regardless of the date, the uncontroverted evidence is that the written reprimand was reduced to a
verbal reprimand.  Because a written reprimand remains part of an employee's personnel file, it
would have been part of Plaintiff's file delivered to him in discovery.  Although Plaintiff now
claims that the written reprimand remained on his record, he has offered no evidence to refute
the County Manager's testimony and the lack of a written reprimand in Plaintiff's file.

not a formal Step 2 grievance procedure, it had the same effect, and Plaintiff can point to no material violation of the Rules and Regulations, nor to any damage that he suffered.

Plaintiff also alleges that Defendants violated the Rules and Regulations by initially issuing him a written reprimand, apparently claiming that the progressive discipline policy set forth in the Rules and Regulations requires that a verbal reprimand be issued before a written reprimand can be issued. However, the Rules and Regulations contain no such rule. Section 605(A) of the Rules and Regulations states that "Each...act of misconduct shall be judged separately and individually. The level of discipline used depends on the severity of the infraction and the employee's previous work record." Def't. Mot. 2 [Doc. 27], Ex. 2 at § 605(A). Similarly, the section governing written reprimands indicates that a written reprimand will be given "in circumstances where the infraction is perceived to be of a greater consequence than that for which a verbal reprimand would be used." *Id*. at § 605(B)(2)(a). Plaintiff has failed to identify any breach of the Rules and Regulations stemming from Defendants' lowering of a potential suspension to a written reprimand to a verbal reprimand. Nothing in the Rules and Regulations requires Defendants to issue a verbal warning as the first phase of a disciplinary proceeding. Thus, Plaintiff cannot prevail on his breach of contract claim.

      B.    <u>Breach of Covenant of Good Faith and Fair Dealing</u>

Plaintiff correctly states that, under New Mexico law, every contract, "whether express or not,...imposes upon the parties a duty of good faith and fair dealing in its performance and enforcement." *Bourgeous v. Horizon Healthcare Corp.*, 117 N.M. 434, 438 (1994). However that duty, by itself, does not create a separate cause of action for every grievance that an employee may have against an employer. Although contracts impose a duty of good faith and

fair dealing on both parties, New Mexico courts do not "recognize a cause of action in an at-will contract for breach of an implied covenant of good faith and fair dealing," nor have they applied "an implied covenant of good faith and fair dealing to override express provisions addressed by the terms of an integrated written contract." *Id*. at 438. In addition, "tort remedies are not available for breach of the implied covenant in an employment contract;" instead, the only remedy available is contract damages. *Id*. at 439.

Plaintiff contends, as discussed in the previous section, that the Rules and Regulations issued by Defendants transform his employment from an at-will situation to one covered by an implied contract. Even assuming for purposes of summary judgment that the Rules and Regulations comprise an implied contract subject to the covenant of good faith and fair dealing, Plaintiff still cannot prevail on this claim.

Because Plaintiff relies on the Rules and Regulations to establish an implicit contract, he can only prevail on his claim by showing which promises in the contract were breached, or which benefits guaranteed by the contract were withheld by defendant. *See Azar v. Prudential Ins. Co. of Am.*, 133 N.M. 669, 685 (Ct. App. 2003) (holding that "the implied covenant is aimed at making effective the agreement's promises," so that "it is breached only when a party seeks to prevent the contract's performance or to withhold its benefits from the other party."). Plaintiff lists a litany of grievances that he claims demonstrates that Defendants violated the covenant of good faith and fair dealing. *See* Amended Complaint [Doc. 44] at 13, ¶ 110.[2] However, none of these grievances actually alleges a violation of the express terms of the Rules and Regulations.

---

[2] The Amended Complaint contains two separate sets of paragraphs numbered 105-111, with one set under the heading of "Count I," and the other set under the heading of "Count II." The paragraph 110 referred to here is the one under the heading of "Count II."

As held in the previous section, none of Defendants' actions resulted in a material violation of the Rules and Regulations, and without a showing that benefits guaranteed by the contract were withheld, Plaintiff cannot prevail on this claim.

      C.    <u>Age Discrimination in Violation of the ADEA</u>

      Plaintiff contends that he was discriminated against in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.* ("ADEA"). The ADEA makes it "unlawful for an employer . . . to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions or privileges of employment, because of such individual's age." 29 U.S.C. 623(a)(1). In evaluating an ADEA claim based on indirect evidence of discrimination, the Tenth Circuit has adopted the burden-shifting framework outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973), and its progeny. *See, e.g.*, *McKnight v. Kimberly Clark Corp.*, 149 F.3d 1125, 1128 (10th Cir. 1998) (applying *McDonnell Douglas* to an ADEA claim). To bring a successful ADEA claim under this framework, a plaintiff must initially establish a prima facie case of age discrimination. *See McDonnell Douglas,* 411 U.S. at 802. This burden is "not onerous." *Plotke v. White*, 405 F.3d 1092, 1099 (10th Cir. 2005). If the plaintiff can establish a prima facie case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason" for its action. *McDonnell Douglas*, 411 U.S. at 802. If the defendant meets this burden, "summary judgment is warranted unless the employee can show there is a genuine issue of material fact as to whether the proffered reasons are pretextual." *Plotke*, 405 F.3d at 1099.

      A plaintiff in a discrimination case such as this one, which does not involve a termination or failure to hire, "makes out a prima facie case upon showing: (1) that plaintiff belongs to a

protected class; (2) that he suffered an adverse employment action; and (3) that the adverse employment action occurred under circumstances giving rise to an inference of discrimination." *Hysten v. Burlington Northern & Santa Fe Ry.*, 296 F.3d 1177, 1181 (10th Cir. 2002). In this case, it is undisputed that Plaintiff is a member of a protected class, as he was over the age of forty at the time of the events giving rise to this suit. The Court must therefore determine whether Plaintiff suffered an adverse employment action, and, if so, whether that action took place under circumstances giving rise to an inference of discrimination.

       1. Adverse Employment Action

An adverse employment action is "a significant change in employment status such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998). The Tenth Circuit has held that "adverse employment action" should be "liberally defined." *Stinnett v. Safeway, Inc.*, 337 F.3d 1213, 1217 (10th Cir. 2003) (*citing Sanchez v. Denver Pub. Sch.*, 164 F.3d 527, 532 (10th Cir. 1998). Adverse employment actions are not "limited to monetary losses in the form of wages or benefits." *Sanchez,* 164 F.3d at 532. Instead, a court should "take a case-by-case approach, examining the unique factors relevant to the situation at hand." *Id*.

In this case, the Court does not find that Plaintiff's verbal reprimand constitutes an adverse employment action. Additionally, because the court finds that Plaintiff was not constructively discharged, as discussed below in detail, Plaintiff cannot use that claim to constitute an adverse employment action. However, the Court finds that Plaintiff has come forward with sufficient evidence to indicate that his transfer from his position as Parks Area

Supervisor to a Coordinator at the JDC, under these particular circumstances, may constitute an adverse employment action.

Certainly, transfers presenting nothing beyond a "mere inconvenience or alteration of responsibilities," do not constitute an adverse employment action. *Sanchez*, 164 F.3d at 532 (characterizing the reassignment of a fourth-grade teacher to work as a second-grade teacher at another school as a "purely lateral transfer," and rejecting the teacher's argument that this constitutes an adverse employment action merely because her commute time increased and no other teachers volunteered for the transfer). A plaintiff's preference is not relevant in determining whether a transfer is an adverse employment action, nor is an undesired reassignment automatically a demotion. *See James v. Sears, Roebuck & Co., Inc.*, 21 F.3d 989, 993 (10th Cir. 1994). However, a reassignment can constitute an adverse employment action if an "employee can show that he receives less pay, has less responsibility, or is required to utilize a lesser degree of skill than his previous assignment." *Id*. (quoting *Hooks v. Diamond Crystal Specialty Foods, Inc.*, 997 F.2d 793, 799 (10th Cir. 1993)).

Although Plaintiff's pay and grade did not change as a result of the transfer, *see* Notice of Transfer, attached as Ex. 8 to Def't. Mot. 2 [Doc. 27], and the County considers Coordinators to be at an equivalent level to Supervisors, *See* Deposition of Renetta Torres, attached as Ex. 12 to Deft's Mot. 2 [Doc. 27] at 89:24-90:4, Plaintiff has nonetheless come forward with sufficient evidence to create a question of fact as to whether the transfer to his new position gave him less responsibility and required him to utilize a lesser degree of skill than his previous position. Plaintiff offered evidence tending to demonstrate that his new position at the JDC gave him less responsibility and required less skill than his position as Parks Area Supervisor. Plaintiff

16

contends that, in his previous position, he supervised multiple subordinate employees and was responsible for evaluations, handling leave requests, and overseeing the functioning of his department. *See* Plaintiff's Supplemental Affidavit, attached as Ex. 5 to Pl. Resp. 2 [Doc. 34] at 1; Position Description, attached to Plaintiff's Supplemental Affidavit.  In contrast, in his new position at the JDC, Plaintiff no longer routinely supervised employees, conducted evaluations, or performed other managerial functions as he had previously. *See* Plaintiff's Supplemental Affidavit, attached as Ex. 5 to Pl. Resp. 2 [Doc. 34] at 1.  Although the Position Description for Plaintiff's new position at the JDC included supervisory duties, Plaintiff has testified that he never actually was given the opportunity to perform the work in the job description. *See* Plaintiff's Deposition, attached as Ex. 1 to Pl. Resp. 2 [Doc. 34] at 91:3-16.

The Court cannot say on this record that Plaintiff's transfer did not result in a significant reduction of responsibilities.  Although Plaintiff's wage level and Grade remained the same after the transfer, he has provided some evidence that his transfer resulted in a de facto reduction in responsibility and required a lesser degree of skill.  As such, he has created a question of fact as to whether he suffered an adverse employment action through the transfer.

### 2.  Circumstances Giving Rise to an Inference of Discrimination

Plaintiff must still demonstrate "that the adverse employment action occurred under circumstances giving rise to an inference of discrimination." *Hysten*, 296 F.3d at 1181.  Plaintiff has come forward with sufficient evidence to meet this burden.  He has presented the statement of a former co-worker, Bernadette Jaramillo, who claimed that she heard the Director of Bernalillo County Parks and Recreation state, in June 2004 (prior to the transfer), that she

planned to "put [Plaintiff] in the back somewhere until he retires."[3]  *See* Plaintiff's Deposition at

100:6-8; Statement of Bernadette Jaramillo, attached as Ex. 5 to Pl. Resp. 2 [Doc. 34].[4]  Plaintiff

also testified that he was asked several times by various supervisors when he planned to retire.

In addition, he presented testimony from a former co-worker, Santiago Moya, that when

Defendant Berglund was introduced to Plaintiff as his new supervisor, prior to the transfer,

Berglund said to Plaintiff "well, I know you're about to retire anyway."  Deposition of Santiago

Moya, attached as Ex. 2 to Pl. Resp. 2 [Doc. 34] at 23:1-5.  Finally, Plaintiff presented testimony

of another employee of the Parks and Recreation Department regarding his concerns about age

discrimination within the Department, stating that it is customary for employees to be terminated

or forced out of the Department just prior to retirement, and that in 25 years of employment, he

had seen only one person actually retire from the Department.  *See* Deposition of Martin

Candelaria, attached as Ex. 6 to Pl. Resp. 2 at 26-27, 38:24-39:14.  This constitutes sufficient

evidence to meet Plaintiff's "slight" burden at this stage in creating an inference of

discrimination.  *See Orr v. City of Albuquerque*, 417 F.3d 1144, 1149 (10th Cir. 2005).

### 3.   A Legitimate, Non-discriminatory Reason for Action

Because Plaintiff has made a prima facie case, Defendants must demonstrate that they

had a legitimate, non-discriminatory reason for the adverse employment action.  *See McDonnell*

*Douglas*, 411 U.S. at 802.  Defendants easily meet this burden.  The County Manager testified

---

[3] Although Defendants refer to this evidence as "uncorroborated hearsay," Def't. Rep. 2 [Doc. 37] at 8, as a statement offered against a party that is the party's own statement it is considered non-hearsay under Federal Rule of Evidence 801(d)(2)(A).

[4] Evidence that Defendants intended to "put [Plaintiff] in the back somewhere until he retires" is bolstered by Plaintiff's contention that the investigation into the workplace incident that ultimately resulted in a verbal reprimand took six months, from April 2004 through October 2004, during which time he periodically had no office and had to sit in a chair in the hallway with no work to do.  *See* Plaintiff's Deposition at 63-71.

that the Department Director at the JDC, Tom Swisstack, had for at least two years prior to the

transfer been requesting someone to help him establish a program to work with at-risk youth to

teach them landscaping skills.  *See* Deposition of Thaddeus Lucero*,* attached as Ex. 15 to Def't.

Rep. 2 [Doc. 37] at 40:22-41:8.  Although the County had turned down Mr. Swisstack's budget

requests for the position in the past, prior to the transfer it determined that the program should be

funded and that Plaintiff would be a good fit because of his wide range of knowledge and skills.

*Id*.  Mr. Swisstack also testified in detail at his deposition about the program he wanted to start at

the JDC.  He mentioned that it had been a dream of his to have someone work for him to start a

program providing juvenile inmates with vocational training on landscaping skills, and that he

had written a grant proposal to cover such a program.  *See* Deposition of Tom Swisstack*,*

attached as Ex. 13 to Def't. Mot. 2 [Doc. 27] at 8:1-15.  He went on to testify that his goal was to

work with whomever the County sent him to make the landscape vocational program a national

model project, and that he was excited about having Plaintiff's help because of his talents and

capabilities.  *Id*. at 11:1-19.  Based on this evidence, the Court finds that Defendants have

produced a legitimate, non-discriminatory reason for Plaintiff's transfer.

> 4. <u>Evidence of Pretext</u>

Because Defendants have met their burden, in order to avoid summary judgment,

Plaintiff must next show that a reasonable trier of fact might find age to have been a determining

factor in the employment decision, thus demonstrating that Defendants' reasons are pretextual in

nature. *See Plotke v. White,* 405 F.3d 1092, 1099 (10th Cir. 2005).  The relevant inquiry here is

not whether Defendants' actions were wise, fair, or correct, but whether Defendants honestly

believed those reasons and acted in good faith on those beliefs.  *See Riggs v. Airtran Airways,*

*Inc.*, 497 F.3d. 1108, 1118-19 (10th Cir. 2007).  "Pretext can be shown by such weaknesses,

implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered

legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy

of credence and hence infer that the employer did not act for the asserted non-discriminatory

reasons."  *Morgan v. Hilti, Inc.,* 108 F.3d 1319, 1323 (10th Cir. 1997).

Plaintiff presented evidence that when he was initially transferred to the JDC, he had no

job description, job title, specific responsibilities, or an office.  *See* Plaintiff's Deposition,

attached as Ex. 1 to Pl. Resp. 2 [Doc. 34] at 91-92; Deposition of Tom Swisstack, attached as Ex.

13 to Def't. Mot. 2 [Doc. 27] at 13:21-14:17.  Plaintiff remained without an office for 11 months

and was never listed on the telephone list or given a radio.  *See* Plaintiff's Deposition at 93-94.

Plaintiff claims that he never received training on how to protect himself from potential harm

from inmates.  *Id*. at 92.  Most importantly, Plaintiff testified that he never had the opportunity to

work with juveniles at the facility, which was the stated purpose of transferring him to the

facility.  *Id*. at 90:16-91:16; 93:15-22.

Although it is a close case, the Court finds that, taking the evidence in the light most

favorable to Plaintiff, a reasonable fact finder could find that Defendants' reason for the transfer

was pretextual and that, rather than transferring Plaintiff to the JDC to set up a new program,

they instead set him up to fail and to pressure him to retire.  This claim therefore survives

Defendants' motion for summary judgment.

D.    Race Discrimination in Violation of the NMHRA

Plaintiff claims that Defendants unlawfully discriminated against him based upon his

race in violation of the New Mexico Human Rights Act (hereinafter "NMHRA"), NMSA 1978 §

28-1-7.  A similar standard applies to the analysis of Plaintiff's race discrimination claim under

the NMHRA as to his age discrimination claim under the ADEA.  *See Juneau v. Intel Corp.*, 139

N.M. 12, 15 (2005); *Smith v. FDC Corp.*, 109 N.M. 514, 517 (1990) (In analyzing discrimination

cases brought pursuant to the NMHRA, New Mexico courts use the *McDonnell Douglas* burden-

shifting framework).  Thus, a plaintiff must first establish a prima facie case of racial

discrimination.  Only if the plaintiff can establish a prima facie case of discrimination does the

burden shift to the employer to produce evidence of a legitimate, nondiscriminatory reason for

its actions.  At that point, a plaintiff must rebut the employer's proffered reason with a showing

that the proffered reason was pretextual.

     In order to make his prima facie case, Plaintiff must demonstrate: 1) membership in a

protected class; 2) an adverse employment action, and 3) disparate treatment among similarly

situated employees.  *See Orr v. City of Albuquerque*, 417 F.3d 1144, 1149 (10th Cir. 2005).[5]

The adverse employment action must also occur "under circumstances which give rise to an

inference of unlawful discrimination."  *Kendrick v. Penske Transp. Servs.*, 220 F.3d 1220, 1227

(10th Cir. 2000).  It is undisputed that Plaintiff is a member of a protected class, as he is

Hispanic.  Also, for purposes of this claim, the Court will assume that Plaintiff's transfer and his

verbal reprimand constituted adverse employment actions.  Undoubtedly, the burden on a

plaintiff in articulating a prima facie case of discrimination is "slight," and is based only on

coming forward with the "small amount of proof necessary to create [an inference of

---

[5] Defendants insist that Plaintiff's termination is a necessary component to a prima facie case of
discrimination under the NMHRA.  *See* Pl. Mot. 2 [Doc. 27] at 8-9; Pl. Rep. 2 [Doc. 37] at 8-9.
This is an overly-narrow view of the law, as a plaintiff can state a case for discrimination well
short of termination, as long as he suffers an adverse employment action.  *See Orr v. City of
Albuquerque*, 417 F.3d 1144, 1149 (10th Cir. 2005) (analyzing a case under the NMHRA in
which plaintiffs alleged discrimination short of termination).

discrimination]." *Orr*, 417 F.3d at 1149.  Nonetheless, although slight, Plaintiff's burden is real, and he has failed to come forward with admissible evidence that he was treated differently than similarly situated employees or that Defendants' treatment of him gives rise to an inference of discrimination.

As an initial matter, the version of the NMHRA that was in place at the time Plaintiff filed his Charge with the Human Rights Division required that a Charge be filed within 180 days of the alleged act(s) of discrimination.  NMSA 1978 § 28-1-10(A) (1995).  The current version of the NMHRA, which did not become effective until July 1, 2006, requires that a Charge be filed within 300 days after the alleged discriminatory act(s).  NMSA 1978 § 28-1-10(A) (2005).  Because the prior version of the NMHRA was in effect at the time Plaintiff filed his Charge, the 180 day time limit properly applies.  Plaintiff filed his Charge on April 20, 2005.  *See* Def't. Mot. 2, Ex. 1.  Thus, the Court will not consider any allegedly discriminatory acts that occurred prior to October 22, 2004.  That said, the Court agrees with Plaintiff that it can be important to consider acts occurring outside of the 180 day timeframe to establish an entity's regular practices in order to be able to evaluate whether the allegedly discriminatory acts occurring during the timeframe could give rise to an inference of discrimination.

In this case, Plaintiff attempts to use what he claims to be disparate disciplinary treatment accorded to two Anglo co-workers to create an inference that he was discriminated against because of his race.  First, Plaintiff claims that he was treated less favorably than his co-worker, Robert Kline, whom Plaintiff characterizes as "White/German-American."  Pl. Resp. 2 [Doc. 34] at 17.[6]  The record shows that, in fact, Mr. Kline was subject to three different investigations and

---

[6]  Plaintiff admits that Mr. Kline claims to be Hispanic, and that Plaintiff has no evidence to dispute that he is not Hispanic.  *See* Plaintiff's Deposition at 61-62.  Because the Court finds that

received at least one ten-day suspension, and possibly further disciplinary action. *See* Deposition of Mike Martindale, *id*., ex. 3 at 70-76. Similarly, Plaintiff claims that Carl "Chip" Berglund, also an Anglo, was not disciplined for certain issues. However, in his deposition, Plaintiff admitted that Berglund had been investigated and disciplined by Defendants. *See id*., Ex. 1 at 85. Plaintiff has failed to show that he was subject to a different standard than his co-workers. Furthermore, unlike his age discrimination claim, where Plaintiff could point to several examples of things said by Defendants that could indicate a potential for discrimination based on age, Plaintiff has pointed to nothing to indicate to the Court that his race played any role in his treatment.

      E.    <u>Constructive Discharge</u>

      Although Plaintiff ultimately resigned from his position at the JDC, he alleges that he was constructively discharged because Defendants "made [his] work conditions so intolerable and untenable to the extent that it forced Plaintiff to seek an earlier retirement." Amended Complaint [Doc. 44] at ¶ 125. Constructive discharge is not a separate cause of action, such as a tort or breach of contract. *See Gormley v. Coca-Cola Enters.*, 137 N.M. 192, 194 (2005). It is "a doctrine that permits an employee to recast a resignation as a de facto firing, depending on the circumstances surrounding the employment relationship and the employee's departure." *Id*. Because constructive discharge is not an independent cause of action, but rather only an element of other claims, the Court dismisses this count.

      However, because constructive discharge can be an element of other claims brought by Plaintiff, such as breach of contract, due process violation, and violation of the ADEA or

---

Plaintiff has not shown that he was treated differently than other co-workers, it need not address the question of Mr. Kline's race.

NMHRA, the Court will explain why Plaintiff cannot demonstrate that he was constructively

discharged.  The bar for proving constructive discharge "is quite high."  *Garrett v. Hewlett-*

*Packard Co.*, 305 F.3d 1210, 1221 (10th Cir. 2002).  An employee must come forward with facts

sufficient to find, when viewed objectively, that the employer made working conditions so

intolerable that any reasonable person would be compelled to resign.  *See Derr v. Gulf Oil Corp.*,

796 F.2d 340, 344 (10th Cir, 1986); *Gormley*, 137 N.M. at 194-95.  A plaintiff must essentially

show that he "had *no other choice* but to quit," not merely that his working conditions "were

difficult or unpleasant" due to the actions of his supervisors.  *Yearous v. Niobrara County*

*Mem'l Hosp.*, 128 F.3d 1351, 1356, 1357 (10th Cir. 1997) (emphasis in original).  *See also Tran*

*v.Trs. of State Colls. of Colo.*, 355 F.3d 1263, 1271 (10th Cir. 2004) ("[A] constructive discharge

requires a showing that the working conditions imposed by the employer are not only...adverse,

but intolerable.").  The Court assesses a constructive discharge claim based on a reasonable

person test, not on Plaintiff's subjective views of the situation or his employer's intent.  *Yearous*,

128 F.3d at 1356; *Tran*, 355 F.3d at 1270.

Even assuming all of Plaintiff's contentions are true, he cannot demonstrate that he was

constructively discharged.  Plaintiff places a good deal of emphasis on the physical effects that

his job-related stresses had on him, including citing medical records that recorded headaches,

trouble sleeping, and depression.  However, these records do not help Plaintiff because "the fact

that a plaintiff subjectively considers his or her workplace stressful and may have suffered

personal health problems as a result is not an objective criterion used to determine if a

reasonable employee would have been compelled to resign."  *Potts v. Davis County*, 551 F.3d

1188, 1195 (10th Cir. 2009) (quoting *Exum v. U.S. Olympic Comm.*, 389 F.3d 1130, 1136 n.7

(10th Cir. 2004)).  Plaintiff also discusses the danger involved in working at the JDC, but the record indicates that the juveniles he was scheduled to work with in his program were not incarcerated, but were instead the juveniles that courts specifically released pending trial because they were deemed to not be escape risks or to pose any danger to themselves or others.  *See* Deposition of Tom Swisstack, attached as Ex. 13 to Def't. Mot. 2 [Doc. 27] at 8:23-9:13. Although Plaintiff alleged that he had one time been in an altercation with juveniles at the JDC, he acknowledged at his deposition that the "altercation" consisted of his breaking up a fight, and that he had never been attacked.  Plaintiff's deposition at 88:20-89:4.  Finally, although Plaintiff alleges that he was not given an office or a concrete job description, and that he did not work with the juveniles as he had been told he would this is not sufficient to support a finding of constructive discharge.  Although Plaintiff found his new position less stimulating than his old one, and may not have commanded the same level of respect that he had previously, he has not shown that it was intolerable.  Plaintiff was placed in a newly-created position and tasked with developing a new program, so it is hardly surprising that not everything would be in place when he first started.  He offered no evidence in the record that he tried to change the conditions of his employment through talking to his supervisor or anyone in the chain of command.  The Court cannot say that a reasonable person in the circumstances described by Plaintiff would have felt the working conditions to be so intolerable that he or she had no other choice but to resign.

   F. <u>First Amendment Freedom of Speech</u>

   Plaintiff claims that he was punished, by being disciplined and ultimately transferred, for engaging in protected speech.  *See* Amended Complaint [Doc. 44] at 16, ¶ 131; Pl. Resp. 2 [Doc. 34] at 19.  The speech that Plaintiff claims was protected and that led to his punishment was

complaints to his superiors "about work place violence, stolen county property, his office being vandalized, a Bobcat being stolen, and inappropriate conduct by Defendant Berglund." Pl. Resp. 2 [Doc. 34] at 19.[7]  Even assuming for purposes of summary judgment that Plaintiff's reprimand was unwarranted and that his transfer constituted disciplinary action, his First Amendment freedom of speech claim nevertheless fails.

As an initial matter, Plaintiff relies upon *Bisbee v. Bey*, 39 F.3d 1096 (10th Cir. 1994), which uses the now-superceded test set forth in *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968) to analyze the question of whether Plaintiff's speech was protected.  Under the *Bisbee/Pickering* test, an employee had to show, as a threshold matter, that his speech involved a matter of public concern.  The Supreme Court's decision in *Garcetti v. Ceballos*, 547 U.S. 410 (2006), modified the *Pickering* test in a significant manner.  Under the *Garcetti* test, before reaching the question of whether the speech at issue involved a matter of public concern, a court must first determine whether the public employee was speaking pursuant to his official duties, or was speaking instead as a private citizen.  *Id*. at 421.  When public employees speak "pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline."  *Id*.  If an employee speaks pursuant to his official duties, he has no constitutional protection because the restriction on speech "simply reflects the exercise of employer control over what the employer itself has commissioned or created."  *Id*.  The Tenth Circuit has recognized the shift brought about by *Garcetti*, writing that "[t]he question for us on *Pickering's* first prong is thus significantly modified, and we are obliged to ask whether [the public employee] met her burden

---

[7] The pages of Plaintiff's Response are not actually numbered, but the cited text is found on the 19th page.

by providing evidence that her expressions were made in her capacity as a citizen and not

pursuant to her 'official duties.'"  *Casey v. W. Las Vegas Indep. Sch. Dist.*, 473 F.3d 1323, 1328

(10th Cir. 2007).

      As discussed in *Brammer-Hoelter v. Twin Peaks Charter Acad.*, 492 F. 3d 1192, 1202-03

(10th Cir. 2007), after *Garcetti,* an analysis of First Amendment claims consists of five prongs:

(1) The court must first determine whether the employee was speaking pursuant to his official

duties; (2) if it is determined that the employee was speaking as a citizen rather than pursuant to

his official duties, the court must then determine whether the subject of the speech is a matter of

public concern; (3) if the employee was speaking as a citizen about a matter of public concern,

the court must determine "whether the employee's interest in commenting on the issue

outweighs the interest of the state as employer"; (4) if the employee's interest outweighs that of

the employer, the employee must demonstrate that the speech was a "substantial factor or a

motivating factor in [a] detrimental employment action"; and (5) if the employee is able to

demonstrate that his speech was a motivating factor in an adverse employment action, "the

employer may demonstrate that it would have taken the same action against the employee even

in the absence of the protected speech."  The first three of these prongs are to be resolved by the

district court, while the last two are ordinarily left in the hands of the trier of fact.  *Id.* at 1203

(citation omitted).

      In this instance, the Court need not move beyond the first prong of the *Garcetti* analysis,

because Plaintiff plainly engaged in these incidents of speech pursuant to his official duties.  The

Tenth Circuit has defined the "official duties" test as follows: if a public employee "engages in

speech during the course of performing an official duty and the speech reasonably contributes to

or facilitates the employee's performance of the official duty, the speech is made pursuant to the employee's official duties" and is not protected by the First Amendment.  *Brammer-Hoelter*, 492 F.3d at 1203.  Reports to superiors about workplace violence, stolen county property, office vandalization, or inappropriate behavior by a co-worker all fall within Plaintiff's official duties, or at least would facilitate the performance of his official duties.  Even if reporting workplace violence and inappropriate behavior is not within Plaintiff's job description, "[a]n employee's official job description is not dispositive...because speech may be made pursuant to an employee's official duties even if it deals with activities that the employee is not expressly required to perform."  *Id*.  "The ultimate question is whether the employee speaks as a citizen or instead as a government employee--an individual acting 'in his or her professional capacity.'" *Id*. (quoting *Garcetti*, 547 U.S. at 422).  In this case, all of the speech for which Plaintiff was allegedly punished was made in his capacity as a government employee acting in his professional capacity, rather than as a private citizen, so his First Amendment free speech claim must fail.

       G.    <u>Due Process Rights</u>

Plaintiff claims that Defendants violated his Due Process rights in two ways: 1) "he was not given any due process with regards to his Step 2 grievance or transfer"; and 2) "what little process he was given with regards to the investigation against him and in his discipline prior to the Step 2 grievance was clearly insufficient."  Pl. Resp. 2 [Doc. 34] at 21.[8]  Procedural due

---

[8] Plaintiff's amended complaint alleges, without elaborating, that Defendants deprived Plaintiff of both substantive and procedural due process rights.  *See* Amended Complaint [Doc. 44] at 17, ¶ 137.  However, Plaintiff's briefing never addresses or clarifies his substantive due process claim, and only discusses his allegations of procedural due process violations.   Because Plaintiff never developed this argument, the Court considers it waived.

process claims have three elements.  The plaintiff must demonstrate: 1) that the defendant deprived him of a recognized liberty or property interest (such as a property right to employment); 2) that some process was due prior to the deprivation; and 3) that the process provided was inadequate or non-existent.  *See Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532 (1985).  Plaintiff has failed to meet this burden.

With respect to Plaintiff's transfer to the JDC, he has not demonstrated a recognized property interest in maintaining his prior position as a Parks Area Supervisor, nor has he demonstrated that any process was due prior to his transfer.[9]  The Tenth Circuit has recognized that "no protected property interest is implicated when an employer reassigns or transfers an employee absent a specific statutory provision or contract term to the contrary."  *Anglemyer v. Hamilton County Hosp.*, 58 F.3d 533, 539 (10th Cir. 1995).  Under the Rules and Regulations, transfers are not grievable actions.  *See* Def't. Mot. 2 [Doc. 27], Ex. 2 at § 703(A)(8).  Plaintiff has failed to identify any statutory provision or portion of the Rules and Regulations that prohibits a transfer without due process.

With respect to Plaintiff's Step 2 grievance, as discussed previously, the record indicates that Plaintiff did discuss his written reprimand with the County Manager, as provided for in the Step 2 grievance process, and that this discussion resulted in having his written reprimand dropped to a verbal reprimand.  The Rules and Regulations explicitly indicate that a verbal reprimand cannot be grieved, *see id*. at § 605(B)(1), and Plaintiff has failed to identify any

---

[9] Plaintiff correctly notes that, as a public employee who can only be terminated for cause, he has a recognized property interest in continued employment, and that this interest can be invoked in the event of a constructive discharge.  *See Bailey v. Kirk*, 777 F.2d 567, 579 (10th Cir. 1985). However, because the Court holds that Plaintiff was not constructively discharged, this argument is inapplicable.

statutory provision or portion of the Rules and Regulations that require a greater process than he received.

H.      First Amendment Freedom of Association

Plaintiff contends that Defendants violated his First Amendment right to freedom of association.  The First Amendment implicitly protects the freedom to expressive association. *See Grace United Methodist Church v. City of Cheyenne*, 451 F.3d 643, 658 (10th Cir. 2006). The right to familial association is also constitutionally protected.  *See Trujillo v. Bd. of County Comm'rs*, 768 F.2d 1186, 1188-89, 1190 n.7 (10th Cir. 1985).  A plaintiff alleging a violation of the right to expressive association must support his claim by demonstrating, *inter alia*, some form of government action to impose penalties for the expression of political views, *see Roberts v. United States Jaycees*, 468 U.S. 609, 622 (1984), while a plaintiff claiming a violation of the right to familial association must show that the defendant had the specific intent to interfere with the familial relationship, *Trujillo*, 768 F.2d at 1190.

Plaintiff's only allegations concerning his freedom of association claim are that: 1) Defendants have accused Plaintiff's sister, Mary Herrera, who currently serves as New Mexico Secretary of State and who formerly served as Bernalillo County Clerk, of interfering with the disciplinary process to which Plaintiff was subject; 2) Defendant Lucero, who ultimately took Plaintiff's discipline from a proposed suspension down to a verbal reprimand, acknowledged that politics plays some role in every level of his work; and 3) Plaintiff was accused, during an internal investigation, of buying paint for his sister's campaign with County funds.  See Pl. Resp. 2 [Doc. 34] at 23.  These allegations fail to present any evidence that Plaintiff was punished for any association with his sister or for supporting her politically.  If anything, the record indicates

that Plaintiff's association with his sister actually aided him, through a reduced disciplinary procedure that occurred at her behest.  As such, Plaintiff's freedom of association claim must fail.

<u>**CONCLUSION**</u>

**IT IS THEREFORE ORDERED** that Defendants' Motion to Dismiss Counts I, II, V, VI, VII, VIII, IX, X, AND XI, filed October 20, 2008 [Doc. 26] and Defendants' Motion for Partial Summary Judgment of Plaintiff's Amended Complaint, filed March 3, 2009 [Doc. 46] are GRANTED.  Defendants' Motion for Partial Summary Judgment, filed October 20, 2008 [Doc. 27] is GRANTED in part and DENIED in part.

**UNITED STATES DISTRICT JUDGE**